1 | Amir M. Kahana, Esq. (SBN 218149)
2 | Samuel Yu, Esq. (SBN 251636)
  | KAHANA LAW, P.C.
3 | 18101 Von Karman Ave., Suite 230
  | Irvine, CA 92612
4 | Telephone (949) 812-4783
  | Facsimile (949) 281-2105
5 | E-mail: amk@kahanalaw.com;
  | samyu@kahanalaw.com

6 | Attorneys for Plaintiffs Matthew
7 | Johnson, Nathan Johnson, Gemini
  | Partners, Inc., and Alacrity Capital
8 | Offshore Fund, Ltd.

9 |                     UNITED STATES DISTRICT COURT

10 |       CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| MATTHEW JOHNSON, an individual; NATHAN JOHNSON, an individual; GEMINI PARTNERS, INC., a California corporation; and ALACRITY CAPITAL OFFSHORE FUND, LTD., a Cayman Islands limited partnership, | Case No.: 2:15-CV-09183-ODW(ASx) |
|---|---|
| | Judge: Honorable Otis Wright, II |
| | **FIRST AMENDED COMPLAINT FOR:** |
| | **(1) FRAUD;** |
| | **(2) FRAUDULENT INDUCEMENT;** |
| Plaintiffs, | **(3) FRAUDULENT TRANSFER; AND** |
| | **(4) CONSTRUCTIVE FRAUDULENT TRANSFER** |
| v. | |
| | **DEMAND FOR JURY TRIAL** |
| DAVID MAZZA; an individual; PAUL M. WEST, an individual; ANTHONY ALLEN WOOD, an individual; JOSEPH D. SIMMS, an individual; CHRISTOPHER ALLEGRETTI, an individual; HBK SORCE FINANCIAL, LLC, an Ohio limited liability company; HILL, BARTH & KING LLC, an Ohio limited liability company; HA&W WEALTH MANAGEMENT LLC, a Delaware limited liability company; HABIF, AROGETI & WYNNE, LLP, a Georgia limited liability company; and DOES 1 through 50, inclusive, | |
| Defendants. | |

---

FIRST AMENDED COMPLAINT

MATTHEW JOHNSON, NATHAN JOHNSON, GEMINI PARTNERS, INC., and ALACRITY CAPITAL OFFSHORE FUND, LTD. (collectively, "Plaintiffs"), hereby file this First Amended Complaint complaining of the conduct of DAVID MAZZA, PAUL M. WEST, ANTHONY ALLEN WOOD, JOSEPH D. SIMMS, CHRISTOPHER ALLEGRETTI, HBK SORCE FINANCIAL, LLC, HILL, BARTH & KING LLC, HA&W WEALTH MANAGEMENT LLC, HABIF, AROGETI & WYNNE, LLP, and DOES 1 through 50 (collectively, "Defendants").

## PRELIMINARY STATEMENT

1.     In this case, a group of individuals and entities used fraud to induce Plaintiffs to put $1 million into a start-up business.  Defendants claimed to have a unique model built around a $5-million proprietary software package that was deployed, fully operational, and ready to throw off a tremendous amount of business exclusively for the benefit of Plaintiffs.

2.     The model actually was a poor copy of what others had done.  The software was not even developed, much less deployed, and Defendants did not even own it.  The promoters were mired in undisclosed debts and claims.  The promised pipeline of business for Plaintiffs was a fiction.

3.     What made the fraud believable was not the claims of the promoters. It was the praise of their customers.  Two of the nation's top-100 accounting firms reassured Plaintiffs that the software was deployed at their firms, that it was operational, that it was unique in the industry, and that they were fully committed to the new business model.  They promised that Plaintiffs would be overwhelmed with business that the model would generate.

4.     What Defendants did not disclose was that the accounting firms were the masterminds behind the entire fraud.  Both had been part of previous attempts by much bigger players to launch the same business model.  Believing they could

make more money on their own, the accounting firms copied the business model and supported the other Defendants in promoting it.

5. Repeated failures left the accounting firms with nothing to show for their efforts but losses, and their front men—the Defendants who were promoting the model—had spent all the money, had been sued on multiple fronts, could not execute the plan, and needed money just to prevent the façade from collapsing. If it collapsed, the accounting firms would be exposed.

6. So the accounting firms and the other Defendants worked together to dupe the Plaintiffs into investing $1 million into the failed and hopeless business model, and then maintained the fraud for years to avoid discovery.

7. As more fully discussed below, Plaintiffs discovered the fraud early this year, and now bring suit against all Defendants to recover damages. Plaintiffs Matthew Johnson, Nathan Johnson, and Gemini Partners, Inc. are California residents, and upon information and belief, the agreements that are the subject of this action were entered into in Los Angeles, California and were to be performed in Los Angeles, California.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, which authorizes jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000 and is between citizens of different States. Venue is proper pursuant to 28 U.S.C. § 1391(b) and (c).

9. This Court has personal jurisdiction over the Defendants, in that Defendants David Mazza, Paul M. West, and Anthony Allen Wood have contacted Plaintiffs in California beginning in early 2010 to present an investment opportunity. Plaintiffs informed these Defendants that they reside in Los Angeles, California and that their businesses were a California corporation. Prior to Defendants David Mazza, Paul M. West, and Anthony Allen Wood's contact, Plaintiffs had never reached out to them regarding any investment opportunity or

FIRST AMENDED COMPLAINT

1  business transaction.  Defendants David Mazza, Paul M. West, and Anthony Allen

2  Wood made numerous calls throughout 2010, and much of these calls and

3  conferences took place in Los Angeles.  Plaintiff ultimately executed the written

4  agreements in Los Angeles, California where the contracts were to be performed.

5  Defendants are also believed to have visited California on multiple occasions, and

6  Defendant Anthony Allen Wood met with Plaintiffs in Los Angeles after the initial

7  funding that is detailed below.  Defendants are further believed to have solicited

8  and conducted substantial business within the State of California and within this

9  judicial district.

10                          **GENERAL ALLEGATIONS**

11        10.    Plaintiff Matthew Johnson is an individual residing in the County of

12  Los Angeles, State of California.

13        11.    Plaintiff Nathan Johnson is an individual residing in the County of

14  Los Angeles, State of California.

15        12.    Plaintiff Gemini Partners, Inc. is a California corporation with its

16  principal place of business in the County of Los Angeles, State of California.

17        13.    Plaintiff Alacrity Capital Offshore Fund, Ltd. is a limited partnership

18  with its principal place of business in the Cayman Islands.

19        14.    Upon information and belief, Defendant David Mazza is an individual

20  residing in the State of Florida.

21        15.    Upon information and belief, Defendant Paul M. West is an individual

22  residing in the State of Nebraska.

23        16.    Upon information and belief, Defendant Anthony Allen (Tony) Wood

24  is an individual residing in the State of Florida.

25        17.    Upon information and belief, Defendant Joseph D. (Dan) Simms is an

26  individual residing in the State of Georgia.  Upon information and belief, Joseph

27  Simms was a partner at Habig, Arogeti & Wynne, LLP ("HA&W") at all relevant

28  times.

FIRST AMENDED COMPLAINT

18.     Upon information and belief, Defendant Christopher (Chris) Allegretti is an individual residing in the State of Pennsylvania.   Upon information and belief, Chris Allegretti was a partner at Hill, Barth & King LLC ("HBK") at all relevant times.

19.     Upon information and belief, Defendant HBK Sorce Financial LLC is an Ohio limited liability company with its principal place of business in Youngstown, Ohio.

20.     Upon information and belief, Defendant Hill, Barth & King LLC is an Ohio limited liability company with its principal place of business in Canfield, Ohio.

21.     Upon information and belief, Defendant HA&W Wealth Management LLC is a Delaware limited liability company with its principal place of business in Wilmington, Delaware.

22.     Upon information and belief, Defendant Habif, Arogeti & Wynne, LLP is a Georgie limited liability company with its principal place of business in Atlanta, Georgia.

23.     Defendants, DOES 1 through 50, inclusive, are sued herein under fictitious names.   Their true names and capacities are unknown to Plaintiff.   When their true names and capacities are ascertained, Plaintiff will amend this Complaint by inserting their true names and capacities herein.

24.     Upon information and belief, each of the fictitiously named defendants, DOES 1 through 50, inclusive, is legally responsible in some manner for the occurrences herein alleged, and that Plaintiff's damages as herein alleged were legally caused by those defendants, and/or that each of the fictitiously named defendants is responsible in some manner for the occurrences herein alleged, and that Plaintiff's injuries as herein alleged were legally caused by such conduct.

25.     Upon information and belief, Defendants in this action were and are the agents, authorized representatives, joint venturers, partners, and/or alter egos of

FIRST AMENDED COMPLAINT

1  one another, and in doing the acts alleged in this complaint, did so jointly and for a

2  common purpose, within the course and scope of his, her or its authority as such

3  agent, representative, joint venturer, partner, and/or alter ego, with the knowledge,

4  consent, permission, and ratification of each other.

5  ## FACTS COMMON TO ALL CAUSES OF ACTION

6      26.    The Johnson brothers are entrepreneurs.  After careers in investment

7  banking, they ventured on their own, building and selling several successful

8  businesses, and thereby generating capital for new projects.  In 2001, they formed

9  Gemini Partners, Inc. (the predecessor in interest to Redwood, herein "Gemini") as

10  an investment bank to provide capital-markets services to medium-sized

11  businesses.  In 2009, they formed Alacrity—a fund that would provide secured

12  loans to companies that could not obtain traditional financing in the wake of the

13  financial crisis.

14      27.    By the end of 2009, Gemini had been in business for eight years and

15  closed a number of high-profile transactions.  Alacrity, although less than a year in

16  business, had placed several good loans.  But, of course, the Johnson brothers

17  wanted more growth.  Many of the referrals they had received for both companies

18  had come from CPAs and other contacts in the financial services industry, so in late

19  2009 and early 2010 they were searching for new referral sources throughout that

20  industry, with particular emphasis on accounting firms.

21      28.    Tom Ramirez, whom the Johnson brothers had previously met through

22  mutual friends in Los Angeles introduced Mazza to the Johnson brothers as his

23  former classmate at Harvard Business School in order to gain credibility.  In early

24  2010, Ramirez and Mazza introduced them to Tony Wood and Paul West, the

25  owners and principals of IPro.  Mazza, Wood, West, and IPro all were promoting a

26  new business model under the name Alethean—a model that was both simple and

27  compelling.  During each of the Johnson brothers' initial contacts with Mazza,

28  Wood and West, the Johnson brothers' informed them the they resided in Los

FIRST AMENDED COMPLAINT

Angeles, California and primarily conducted their business there including their California corporation, Gemini Partners, Inc.

29.     The clients of CPAs often need financial services that an accounting firm, standing alone, cannot provide, such as insurance, receivables financing, wealth management, investment banking, and securities brokerage.  It was not unusual for accounting firms to have subsidiaries that provided wealth management services for the firm's clients, and these subsidiaries would obtain licensing as a Registered Investment Advisor ("RIA").

30.     Throughout the months following their introduction, Mazza, Wood and West contacted the Johnson brothers in California to discuss their business proposal.

31.     Tony Wood claimed that his background was in building wealth management RIA subsidiaries for accounting firms, so he was familiar with the struggles faced by CPAs who wanted to source high-quality financial services for their clients.  He said he had developed a unique, proprietary way to solve that problem with technology.

32.     Wood and West said they had formed IPro to develop a web-based portal called CPA360, along with a supporting software package for client relationship management ("CRM") called CRM360.  The CRM software would reside on the CPA's computer and would be used to collect and manage data about each of the CPA's clients.  CPA360 provided a web portal for interacting with service partners.  Together, the two software packages created a platform for delivering financial services to the CPA client.

33.     When a client needed financial services, the CPA would log into the CPA360 web portal and select a specific module, such as insurance, investment banking, or securities brokerage.  The CPA360 portal would then collect data about the relevant client from the CRM360 software that was resident on the CPA's

1  computer, and produce a report that contained specific financial metrics about that
2  client necessary to evaluating the client's particular need for financial services.

3       34.    That report would then be sent to a pre-screened "partner"—for
4  example, an insurance brokerage partner supporting the insurance module, or an
5  investment banking partner supporting the investment banking module.    That
6  "partner" would then provide quotes or other proposals to the CPA, who would
7  then evaluate those proposals with the client.

8       35.    But for the IPro platform to achieve required efficiencies of scale, it
9  would need to be deployed to all of the CPA partners in large accounting firms, and
10 each accounting firm would need to be committed to using it.    To make that
11 happen, Wood and West developed the Alethean business model, which involved
12 several different types of entities under one umbrella.

13      36.    The pivotal Alethean entity was Alethean Advisor Holdings, LLC
14 ("Alethean Advisor"), which would purchase a minority interest in the RIA
15 subsidiary of the accounting firm.    Under that purchase agreement, Alethean
16 Management, LLC ("Alethean Management") would take over complete control of
17 that RIA subsidiary.    Alethean Technologies, LLC ("Alethean Technologies")
18 would own and operate IPro's technology platform—the CRM360 software and
19 the CPA360 web portal system.    Using its control over the RIA subsidiary,
20 Alethean Management would then deploy the IPro platform across the accounting
21 firm and mandate that all CPAs use it.

22      37.    This new Alethean business model, which Wood and West claimed
23 that they had designed, made sense and had superficial appeal.    What made it
24 immensely compelling, however, was that two of the top-100 accounting firms in
25 the country—HBK and HA&W—already had committed to participate in the
26 model and the leader of each firm was a vocal supporter of Alethean.    The
27 Managing Partners of those two accounting firms—Dan Simms and Chris
28 Allegretti, as well as others—told the Johnson brothers that this new model was

1  desperately needed in the industry, that it was a unique solution, and that both firms

2  were committed to supporting it.  They represented, in fact, that the CPA360

3  system already had been deployed at their firms, where they were Managing

4  Partners.

5      38.    But according to Wood, West, and the representatives of the

6  accounting firms, Alethean needed two things: money, and an investment banking

7  partner.  It needed the money to complete its purchase of a minority interest in

8  HA&W Wealth Management, the RIA subsidiary of HA&W.  And it needed an

9  investment banking partner to handle the tremendous deal flow that would come

10  out of these two accounting firms—HBK and HA&W—that were already set up to

11  use the Alethean/CPA360 system, as well as the many other large accounting firms

12  that Alethean already had lined up to add to its network in coming months.  In

13  return for the investment of $1.0 million to Alethean, Gemini Partners would have

14  iron clad exclusivity on all deals coming out of HA&W and HBK for a term of

15  three years.

16      39.    To facilitate the operations claimed by Defendants, Alethean entered

17  into an Investment Marketing Agreement with Gemini Partners, Inc. in July 2010

18  ("Marketing Agreement").  This Marketing Agreement was executed by West on

19  behalf of Alethean and was signed by Matthew Johnson in California for Gemni

20  Partners, Inc.  Additionally, by the terms of the Marketing Agreement, the contract

21  was to be performed in California through Gemini Partners, Inc.

22      40.    The parties set up meetings in which the Johnson brothers had a

23  chance to meet in person with Dan Simms (of HA&W) and Chris Allegretti (of

24  HBK), as well as others from the accounting firms.   Those representatives

25  unequivocally confirmed that their respective firms were using the CPA360 system

26  and were committed to the Alethean business model.  They reassured the Johnson

27  brothers that the two accounting firms, using the CPA360 system, would generate a

28  significant volume of exclusive investment banking work for Gemini, resulting in

FIRST AMENDED COMPLAINT

millions of dollars in fee revenue.  Specifically, HA&W, HBK, and the Alethean parties represented that they would generate a minimum of $5 million in investment banking fees for Gemini within three years.

41.   Both before and after entering into the Marketing Agreement, Defendants had negotiated with the Johnson brothers in California the terms of a secured loan from Alacrity in the total amount of $1 million, with the first tranche of $500,000 to be advanced May 2010, and the second tranche advanced a few months later.  Gemini would get an exclusive on all investment banking deals generated through the CPA360 system through the Marketing Agreement—which meant all deals generated by HBK and HA&W to start, with other accounting firms to be added in the near future.  For each deal it received, Gemini would pay an agreed-upon referral fee to Alethean, and the referral fee would be used to pay down the outstanding balance due on the loan made by Alacrity.  Plus, Alacrity would have a first lien security interest in all of the assets of Alethean, including the CPA360 software platform, and additional fee income coming to Alethean for other services provided to the accounting firms such as insurance.

42.   With all of the investment banking work that was being promised by the accounting firms, the loan would be paid off in no time.  In addition, the Johnson brothers were assured that the service revenue including insurance and wealth management fees, alone, would generate revenues in excess of $5 million to service the secured loan.  The deal would give Alacrity the chance to place another performing loan, and Gemini would significantly expand its investment banking business.  And although the Johnson brothers were relying on the promises and assurances of Tony Wood, Paul West, Dave Mazza, IPro and Alethean, they derived tremendous confidence and placed significant reliance on the representations and assurances of the representatives of HA&W and HBK, particularly the Managing Partners of these firms, Dan Simms and Chris Allegretti.  The Johnson brothers

FIRST AMENDED COMPLAINT

relied heavily on the credibility of these two accounting firms and their representations, assurances, and support of the Alethean business model.

43.    To give the Johnson brothers further reassurance, Dan Simms actually delivered the first HA&W investment banking deal from the CPA360 system to Gemini in advance of Alacrity making the loan.  Hoshizaki, a client of HA&W, was seeking to purchase two companies in Brazil.  The Johnson brothers had significant experience with investment banking deals in Latin America.

44.    Tony Wood, Paul West, and others at Alethean represented to Plaintiffs that there was no pending litigation, that the CPA360 was owned and controlled by Alethean through its arrangement with IPro, that Alethean had all authority to enter into the agreements and to pledge the assets (including the CPA360 software), and that no other liens existed.  UCC searches and other due diligence appeared to confirm the representations.  It worked out that Matthew Johnson left for Brazil to have the first meeting with Hoshizaki on May 17, 2010, and the first $500,000 tranche of the loan from Alacrity to Alethean funded the next day on May 18, 2010.

45.    The Hoshizaki deal did not immediately turn into an opportunity, but Dan Simms and Chris Allegretti, as well as all the people at Alethean, continued to reassure the Johnson brothers that deal flow would be forthcoming, and in significant quantities.  A few other small deals were sent to Gemini, but again, nothing immediately turned into a revenue-generating opportunity.

46.    Of course, the Johnson brothers were deal makers and wanted to be directly involved in all of the investment banking deals given their agreed upon exclusivity, but Tony Wood, Paul West, Dave Mazza, Dan Simms, and Chris Allegretti all insisted that the Alethean services must operate under the single Alethean brand through the CPA360 platform.  Tony Wood, Dave Mazza, Paul West, Dan Simms and Chris Allegretti all repeatedly demanded that the Johnson

FIRST AMENDED COMPLAINT

brothers communicate with Partners at their firms only through the Alethean people, never directly.

47.   By the time the second tranche of $500,000 was loaned in October 2010, the Johnson brothers were becoming concerned about the quality and quantity of the deals being delivered—only a few deals had been referred, and they were all small and of poor quality.  It did not make sense that HA&W and HBK—two of the top 100 accounting firms in the country—only had these very few, poor-quality deals that they were generating.  But that is exactly what Dan Simms and Chris Allegretti were telling the Johnson brothers.  They said the CPA360 system was implemented at the firms and was being used by the firms' partners, and they further indicated that Gemini was getting the exclusive on all investment banking business generated through the CPA360 system.   They assured the Johnson brothers that the deal flow would come but that it was simply slow for the moment. They kept telling the Johnson brothers to be patient.

48.   Another year passed without further significant deal flow and without proper payments from Alethean to Alacrity.  After multiple demands, Alethean finally came forward in September 2011 with a payment of around $700,000 but wanted to transfer the business model, the CPA360 platform, and the relationships with the accounting firms to a new group of entities called Method.  Unbeknownst to Plaintiffs, HA&W and HBK were partners with Method.  However, HA&W and HBK continued to reassure the Johnson brothers as to their commitment to the CPA360 system and the overall business model, and that the transfer would not interfere with the deal flow that they would be generating in the future.  Based on the continued reassurances from the accounting firms and the Alethean/Method parties, the transfer was accomplished by way of an Assignment and Assumption Agreement, along with a Forbearance Agreement and other documentation, in September-October 2011.

FIRST AMENDED COMPLAINT

49.     With fees and interest, there was still almost $1 million outstanding on the loan from Alacrity even after the payment, and there had been virtually no deal flow to Gemini.  The Johnson brothers began pressing harder for payment, but the response was always the same—the deal flow will come, the model will work, you just have to be patient.

50.     After another year with no deal flow and no payment, the Johnson brothers made formal demand for payment.  Remarkably, Tony Wood, Paul West, and Dave Mazza all began taking the position that they were no longer involved with the Alethean/Method business model.  Dan Simms, Chris Allegretti, and their respective firms went silent.

51.     In mid-2013, Alacrity filed suit against the Alethean entities in California state court, and after the Alethean entities defaulted, the court granted a default judgment in December 2013.  To the Johnson brothers, it appeared the Alethean entities had become defunct, and the individuals had gone their separate ways.  It was strange, however, that the individuals were refusing to communicate.

52.     In early 2015, while the Johnson brothers were investigating possible collection avenues for the California default judgment, the IPro website suddenly disappeared.  One week it was there. The next week it was gone, and someone else was using the URL.  A search was conducted to determine whether IPro had filed for bankruptcy.

53.     That search did not merely reveal a bankruptcy.  It revealed a number of undisclosed state court lawsuits against some of the Defendants that were active at the very beginning of the relationship.  Documents in those lawsuits revealed other concealed facts that the Defendants had an absolute duty to disclose.

54.     They revealed that the Alethean/Method business model was neither unique nor proprietary, but rather had been copied from the AdvisorPort and Envestnet concepts.  AdvisorPort had been implemented by Paul West's prior employer, with whom the accounting firms and IPro had done business before they

FIRST AMENDED COMPLAINT

decided to copy that model and try to replicate it—first with IPro, then with Alethean, then with Method.

55.   The documents revealed that the CPA360 software had never been fully developed, was never paid for, and was not implemented or deployed at any accounting firm.   Even if it were complete and deployed, it was by no means competitive with the AdvisorPort or Envestnet systems.   The accounting firms knew that CPA360 was not deployed or implemented at their firms, and they were intimately aware of AdvisorPort because they had used it in the past.

56.   The documents revealed that IPro, Wood and West had debts and judgments they could not pay, including obligations owed to the accounting firms. Upon information and belief, the $1 million loan from Alacrity was used to benefit the accounting firms, to put IPro into bankruptcy so that it could avoid overwhelming debt and looming trial settings or rulings in pending lawsuits, and to line the pockets of Wood, West, Mazza, and Longevity Capital Management Group, LLC ("LCMG").

57.   Defendants knew that the CPA360 system was never completed and, even if completed, could never compete.   They never intended to deliver investment banking business to Gemini through the CPA360 system because it was never possible to do so, and the Defendants all knew that.

58.   The accounting firms never intended to give Gemini an exclusive on the investment banking business that those firms generated.   Rather, they simply threw some "bones" to Gemini to keep Plaintiffs interested, and none of those deals ever generated any revenue for Gemini except for one small fee from the Hoshizaki deal.

59.   More importantly, Plaintiffs never received the benefit of their bargain—an exclusive on all investment banking business of HBK and HA&W, which on information and belief, would have resulted in investment banking fees in excess of $10 million over the time period in question.

1  60.    The section below provides a factual history of the fraud taken

2  primarily from various pleadings or documents on file in various lawsuits that

3  Defendants intentionally concealed from Plaintiffs even though Defendants had a

4  duty to disclose them.

5  ## HISTORY OF THE FRAUD

6  61.    An investment advisory firm named Persimmon Capital Management,

7  LP ("PCM"), through its technology affiliate Persimmon Research Partners, Inc.

8  ("PRP"), created a technology platform in 1999 called AdvisorPort.  One principal

9  purpose of AdvisorPort was to provide RIAs with a portal through which they

10  could evaluate and obtain financial services for their clients—financial services

11  such as insurance, brokerage, investment services, etc.

12  62.    In 2001, a number of prominent accounting firms formed Cap Pro

13  Holding, Inc. ("CPH") for the specific purpose of providing financial services to

14  the RIA affiliates of those accounting firms, and CPH did this by using

15  AdvisorPort.  As of September 2005, there were 11 accounting-firm members of

16  CPH, and the largest equity holders were HBK with 47.2 percent, and HA&W with

17  12.2 percent.  All other members held 10 percent or less.

18  63.    Securities America, Inc. ("SAI") is one of the largest independent

19  broker dealers in the country, and it has an investment advisor affiliate called

20  Securities America Advisors, Inc. ("SAA").   SAI and SAA are wholly owned

21  subsidiaries of Securities America Financial Corporation ("SAFC"), which in turn

22  is a wholly owned subsidiary of Ladenburg Thalmann Financial Services, Inc., an

23  investment banking firm which was established in 1876 and is the sixth oldest

24  member of the New York Stock Exchange.

25  64.    On April 8, 2003, SAI and SAA entered into an agreement with PRP

26  under which SAI and/or SAA would provide administrative and back-office

27  support for the AdvisorPort portal.

28

65.   In September 2005, SAFC and the accounting firms of CPH—including HBK and HA&W—formed Capital Professional Advisors, LLC ("CapPro" and also known as Integrated Wealth Associates, LLC), with SAFC owning 25 percent and the rest split evenly among the accounting firms.   The purpose of CapPro was to expand the services and offerings the RIA affiliates of the accounting firms could provide to their clients.   Again using the AdvisorPort portal, SAI would provide broker dealer, investment advisory, and insurance services to the RIAs of the accounting firm affiliates, and those RIAs agreed to transfer their various registrations to SAI.   SAFC paid $850,000 for its 25 percent ownership interest in CapPro, which would be distributed to the CPA members of CapPro proportionately according to the number of RIAs at each affiliate.

66.   CapPro had four managing members—SAFC, HBK, HA&W, and one other accounting firm not involved here.   To assure that CapPro would be managed appropriately, SAFC chose a "long-time SAI employee" to run the company—Paul West.

67.   But SAI and the accounting firms wanted CapPro to expand to include the RIA affiliates of other large accounting firms, and on December 1, 2006, CapPro entered into an agreement with a consulting firm—IPro One, Inc., owned and operated by Tony Wood.   The purpose of the agreement was for IPro to market the CapPro business model to the RIA affiliates of other accounting firms—to target those RIA affiliates and bring them in as new members of CapPro.   The agreement was signed by all four managers of CapPro, including a representative of HA&W and Chris Allegretti on behalf of HBK.

68.   During 2006 to 2007, HBK and HA&W became increasingly unhappy with the arrangement with CapPro and SAI.   They claimed that SAI had failed to provide the required transition and conversion services.   They said "SAI improperly transferred client accounts, resulting in the loss of time, effort, and revenues."   They said SAI misrepresented its ability to integrate its systems with

AdvisorPort, causing "lack of confirm suppression, inaccuracy of client account billings, and erroneous account registrations."  HA&W even alleged that SAI's failures had caused the loss of "at least one customer, an individual with a multimillion-dollar account."

69.   Then, in or around March 2007, SAI claimed that it had been overpaying HA&W the quarterly RIA fees that it was due on the AdvisorPort accounts.  This communication came from Paul West, but later Paul West told HA&W that the problem was an internal mistake on SAI's part.

70.   Upon information and belief, mistakes like these by SAI caused HA&W and HBK to become impatient with the CapPro arrangement, and to begin seeking another avenue by which they could accomplish the same result on their own.  Upon information and belief, they begin discussions with Tony Wood of IPro and Paul West of SAI to support them in developing a business model that would compete with AdvisorPort.

71.   On August 10, 2007, IPro secured an investment in the amount of $2.5 million from Sanders Morris Harris Group, Inc. ("Sanders Morris"), an investment advisory firm headquartered in Houston, Texas, in return for a 20-percent interest in the company.  Upon information and belief, this investment was for the specific purpose of supporting the development of a business model in competition with AdvisorPort, including the development of the competing CPA360 platform.  As discussed below, only months later IPro began developing the CPA360 platform, and Sanders Morris took a security interest in the software.  Upon information and belief, HBK and HA&W were instrumental in helping IPro and Tony Wood obtain the investment from Sanders Morris.

72.   In October 2007, IPro hired Paul West away from CapPro.  In court documents, SAI described Paul West as "a long-time SAI employee and SAFC's designated manager of CapPro to assist IPro in its consulting operations."  In other words, Paul West had been working directly with Tony Wood for almost a year in

FIRST AMENDED COMPLAINT

1   promoting the CapPro business model for the benefit of SAI, and then in October

2   2007 Paul West joined Tony Wood to start marketing IPro's new competing

3   business model.

4        73.   Both HBK and HA&W would have been fully aware of this transition

5   by Paul West.  HBK and HA&W were two of the four managers of CapPro.  Paul

6   West was running CapPro for them.  HA&W and HBK had signed the agreement

7   that engaged the services of IPro.

8        74.   On November 30, 2007—immediately after the defection of Paul

9   West—CapPro terminated its agreement with IPro "because IPro had not

10   performed satisfactorily."  Both HBK and HA&W would have had to sign off on

11   the termination of IPro, and upon information and belief, they did so because they

12   knew IPro was about to start developing and marketing a business model in direct

13   competition with CapPro, SAI, and AdvisorPort.

14        75.   On December 17, 2007—less than three weeks after CapPro

15   terminated IPro's contract—IPro entered into an agreement with Statera, Inc.

16   ("Statera"), a technology firm in Colorado, pursuant to which Statera would

17   develop the CPA360 software system and the related CRM360 program for IPro.

18   The documents show that Statera estimated that the project would be "medium" in

19   size, costing between $250,000 and $750,000 for Statera to develop the software.

20        76.   The next month, in January 2008, IPro hired Keys Tinney, a Colorado

21   resident, to be IPro's Director of National Sales.  Almost immediately thereafter, on

22   February 1, 2008, IPro entered into an agreement with Colgren Communications

23   Group, Inc. ("Colgren"), pursuant to which Colgren would market the IPro

24   business model to the RIA affiliates of accounting firms.

25        77.   In May 2008, IPro announced that it had acquired an ownership

26   interest in HBK Sorce Financial, the RIA affiliate of HBK.  Recall that HBK was

27   still one of the four managers of CapPro, which had just lost its senior manager

28   (Paul West) to IPro, and which had just terminated IPro for failing to perform

satisfactorily.  Also in May 2008, IPro began soliciting various firms to provide brokerage, investment, insurance, and other financial services to the clients of the RIA affiliates of accounting firms through IPro's CPA360 software.

78.    In July 2008, HA&W and its RIA affiliate HA&W Wealth Management (also known as Tegra) signed a letter of intent with IPro pursuant to which IPro would acquire a financial interest in Tegra.  Again, HA&W was still one of the four managers of CapPro.

79.    HBK and HA&W did not merely sign letters of intent.  They also provided IPro, Tony Wood, and Paul West with office space, support services, and personnel.  Tony Wood had an HA&W email address with an HA&W email signature.  Dan Simms (HA&W) and Chris Allegretti (HBK) were both directly involved in, and had full knowledge of, their firms' relationships with SAI, CapPro, and IPro.

80.    During mid-2008, IPro also began soliciting the other accounting firm members of CapPro to leave CapPro and form a "new entity" ("Newco") that would use IPro's CPA360 software as a portal to obtain financial services, with Newco to be run by Tony Wood and Paul West.  Upon information and belief, both HA&W and HBK were fully aware, and supportive, of such solicitations by IPro.

81.    Upon information and belief, during mid-2008, the IPro venture began falling apart.  Possibly Tony Wood and Paul West spent the investment money too quickly or stretched it too thin.  Regardless, court documents reflect that the invoices from Statera—the IT firm that was developing the CPA360 software, which was the foundation of IPro's business model—began going unpaid in July 2008.  Court documents also reflect that invoices from Colgren—the company IPro hired to help market IPro's business model to other accounting firms—began going unpaid in July 2008.  Court documents also reflect that IPro stopped paying Keys Tinney, IPro's Director of National Sales, in July 2008.

82.     Then on September 15, 2008, SAI filed suit against IPro in Nebraska state court (the "SAI Lawsuit").  SAI alleged that IPro had violated the services agreement between IPro and CapPro by improperly using confidential and proprietary information, soliciting employees (including Paul West) to accept employment with IPro, and by "soliciting CPA Members to participate in NEWCO, an entity that is intended to engage in the same business as CapPro."  SAI asserted claims for breach of contract, tortious interference, and permanent injunctive relief.

83.     Already unable to pay its bills to Statera, Colgren, or Tinney, now IPro had to engage lawyers to defend it against the claims of SAI.

84.     On March 13, 2009, Statera filed suit against IPro, Tony Wood, and others, in Colorado state court claiming damages for unpaid invoices (the "Statera Lawsuit").   Statera claimed that invoices totaling $187,121.15 from 2008-09 remained unpaid.

85.     On May 18, 2009, IPro filed a motion for summary judgment in the SAI Lawsuit, supported by the affidavit of Paul West.  The motion asserted that SAI lacked standing because IPro's contract was with CapPro, not SAI, and also that SAI's claim for tortious interference should fail because "the alleged acts of interference fall within the competitor privilege."

86.     On June 15, 2009, Colgren filed suit against IPro in New York state court for failure to pay its outstanding invoices in the amount of $91,800.32, relating to services provided between May and December 2008 (the "Colgren Lawsuit").

87.     On June 22, 2009, HA&W and its affiliates filed suit against SAI in federal court in the Northern District of Georgia (the "HA&W/SAI Lawsuit") for various claims including a declaratory judgment that HA&W did not owe certain back charges claimed by SAI through the relationship with CapPro.   The allegations of HA&W confirm the direct involvement of Dan Simms in communications with SAI, the prior use of Advisorport, the role played by Paul

West, and stated that HA&W had terminated its relationship with SAI by letter dated June 17, 2009, effective June 30, 2009.  SAI counterclaimed for the back charges.

88.   On June 27, 2009, the court in the SAI Lawsuit entered an order denying IPro's motion for summary judgment.  The court found that SAI was an intended third party beneficiary to the agreement between CapPro and IPro, and therefore had standing.  Regarding the "competitor privilege," the court reiterated that the privilege only applies if the actor does not employ improper means, and "[i]n this case, [SAI] has alleged and adduced evidence that [IPro] employed wrongful means."

89.   On July 13, 2009, Statera filed a motion to dismiss without prejudice in the Statera Lawsuit in Colorado.  Statera alleged that none of the defendants (including IPro and Tony Wood) were represented by counsel, and none had filed an answer, but that the parties were in discussions to try to reach an agreement on payment.

90.   No agreement was ever reached with Statera.  Statera never completed the development of the CPA360 Software or the related CRM program.  Any aspect of those programs that had been completed was never made available to IPro, Tony Wood, Paul West, or the Alethean entities for commercial use because Statera was never paid.  IPro, Tony Wood, Paul West, and the Alethean entities never had any right or ability to claim any intellectual property rights in the CPA360 software or the CRM program.

91.   More importantly, the Statera Lawsuit was never disclosed to Plaintiffs, and Plaintiffs were never informed that neither IPro nor Alethean owned the CPA360 software or its related CRM program, nor were they told that the software had not yet been fully developed.  On the contrary, they were told it was up and running, that it was fully deployed at HBK and HA&W, and that it was worth at least $5 million.

92.   On November 6, 2009, IPro's Director of National Sales, Keys Tinney, filed suit against IPro in Colorado state court claiming unpaid back wages and unreimbursed expenses (the "Tinney Lawsuit").

93.   Now, Tony Wood, Paul West, IPro and Alethean (collectively, the "Alethean Parties") were desperate for money.  They could not pay their bills, and they had been sued on multiple fronts.  And they could not even hope to generate revenue unless they could find the money to pay all the legal fees and pay for the CPA360 platform to be fully developed.

94.   At the same time, this was also an irritating problem for HBK and HA&W.  They had been providing office space, personnel, and other support to the Alethean Parties for more than a year.  Worse, HBK and HA&W had bet on the Alethean Parties to provide them with an alternative to their relationship with SAI and CapPro, and that alternative was failing.

95.   During 2009, the Alethean Parties had made contact with Jerald Hampton and S. Bosworth "Bos" Smith of a company called Longevity Capital Management Group, LLC ("LCMG") about the possibility of Hampton making an investment in the Alethean entities.  IPro told Hampton that "IPro/Alethean needed to raise $1 million in capital to complete a specific acquisition" as part of a series of acquisitions of the RIA affiliates of accounting firms.  Instead of making the investment directly, Hampton decided to make it through LCMG, but he was concerned about obtaining more information before making the entire investment.

96.   On December 22, 2009, Hampton sent a letter to IPro indicating his interest in making the $1 million investment, subject to further due diligence.  He then instructed LCMG to perform that due diligence.  LCMG had been previously formed by Hampton and Smith, with Hampton being the financial partner and Smith being the "sweat equity" partner, and each owning 50 percent.  Smith was the only employee and was responsible for performing the due diligence.

FIRST AMENDED COMPLAINT

97.   On December 30, 2009, still mired in financial troubles, IPro transferred its rights to the registered trademark "CPA360" (trademark registration number 3736726) to Peter Savarese, former legal counsel for the company, in exchange for release of his claim for unpaid legal fees.

98.   On January 11, 2010, Keys Tinney was awarded a default judgment against IPro in the amount of $290,434.08 in the Tinney Lawsuit.

99.   On January 29, 2010, LCMG confirmed in writing a prospective transfer of $150,000 to Alethean as an initial advance on the proposed investment of $1 million, but with the caveat that if due diligence resulted in LCMG not moving forward with the investment, the $150,000 would be treated as a loan on commercially reasonable terms.  The letter specifically stated that the advance was "for the purpose of financing [Alethean's] purchase of technology required for [Alethean's] partial acquisition" of a particular registered investment advisor.  In other words, both Bos Smith and LCMG knew at this time that the Alethean Parties had not paid Statera and did not own the CPA360 platform.

100.   On February 3, 2010, LCMG transferred the $150,000 advance to Alethean, but from that point forward, the relationship between Bos Smith and Jerald Hampton broke down.  Hampton refused to move forward with investing the rest of the $1 million, and wanted LCMG to demand repayment of the $150,000.  Bos Smith, on the other hand, claimed control of LCMG and demanded that Hampton move forward with the $1 million investment, which Hampton refused to do.  The result was a split in which Smith retained control of LCMG.  Both LCMG and Smith continued working with the Alethean Parties, and on information and belief they did so because they were promised consulting and other fees from investments made by any investors they helped bring in.

101.   Upon information and belief, it was also in late 2009 to early 2010 that Dave Mazza was brought in by the Alethean Parties to help secure investors,

and Mazza also was promised fees or other compensation in return for bringing investors to the table.

102.   On February 9, 2010, counsel for IPro in the SAI Lawsuit moved to withdraw for non-payment of fees.

103.   On February 23, 2010, Keys Tinney used his default judgment to garnish the last $19,505.95 from IPro's bank account with Bank of America, leaving IPro penniless.

104.   On March 1, 2010, the court in the SAI Lawsuit granted the motion to withdraw of IPro's counsel, and also ordered IPro to produce documents by March 15.   IPro had refused to produce any documents without a cost-shifting order because IPro claimed that it did not have the money to process the electronic documents.   The scheduling order previously entered in the SAI Lawsuit shows that the case was scheduled for jury trial to begin in about three months on June 1, 2010.  The SAI Lawsuit was never disclosed to Plaintiffs.

105.   On March 3, 2010, IPro filed a motion to dismiss in the Colgren Lawsuit based on an affidavit from Tony Wood.  The Colgren Lawsuit was never disclosed to Plaintiffs.

106.   On March 10, 2010, Tony Wood sent his first substantive email to the Johnson brothers.   That email attached PowerPoint presentations about the Alethean concept, all of which placed the CPA360 software front and center as the core of the business model.

107.   On March 17, 2010, Tony Wood caused IPro to file a motion to set aside the default judgment entered in the Tinney Lawsuit.  That document admits that Paul West of IPro was served with process in the Tinney Lawsuit on November 9, 2009, and that both West and Wood were fully aware of Tinney Lawsuit since that time, but that they had been searching for Colorado counsel.

108.   AdvisorPort was not the only system on the market that provided a portal for RIAs to obtain financial services.  On March 26, 2010, a company called

FIRST AMENDED COMPLAINT

1   Envestnet filed for an IPO and announced its intentions to the RIA industry.  In a
2   later article on RIABiz.com, Chip Roame of Tiburon Strategic Advisors was
3   quoted as saying that old competitors like AdvisorPort are diminished in stature,
4   and "Envestnet is way out front now."  All of the Defendants were well aware that
5   CPA360, even if completed and paid for, could not possibly compete with
6   entrenched, well-funded and highly regarded competitors like AdvisorPort and
7   Envestnet.   HBK and HA&W were particularly aware of the capabilities of
8   AdvisorPort because they had used it for years, but none of the Defendants ever
9   mentioned AdvisorPort or Envestnet to any of the Plaintiffs.

10      109.   As discussed above, the dispute between Bos Smith and Jerald
11   Hampton over control of LCMG and over the investment in Alethean eventually
12   resulted in a split in which Smith retained control of LCMG.  But before that split
13   was finalized, Hampton caused LCMG to file suit against Alethean Partners, LLC,
14   and IPro on April 19, 2010, in New York state court seeking recovery of the
15   $150,000 advance (the "LCMG Lawsuit").   Tony Wood, Paul West, IPro and
16   Alethean became aware of the suit immediately because Alethean was served with
17   process on April 21, 2010.  Like the other lawsuits discussed above, the LCMG
18   Lawsuit was never disclosed to Plaintiffs.

19      110.   Separately, on May 6, 2010, Jerald Hampton sued Bos Smith and
20   LCMG for dissolution of LCMG based on the fact that the two 50-percent owners
21   were deadlocked (the "Hampton Lawsuit").  The documents in the LCMG Lawsuit
22   and the Hampton Lawsuit reveal that Dan Simms of HA&W was directly involved
23   in discussions with Hampton and LCMG, and that HBK offered to provide its
24   balance sheet to support a proposed (but rejected) debt arrangement by which
25   Hampton would loan the $1 million instead of invest it for equity.  As mentioned
26   above, the LCMG Lawsuit and the Hampton Lawsuit were later resolved by
27   agreement that resulted in Smith retaining control of LCMG.

28

FIRST AMENDED COMPLAINT

111.   On May 11, 2010, while the Alethean Parties, Bos Smith and LCMG were negotiating final documentation with Plaintiffs for Alacrity's initial loan of $500,000, IPro filed its answer in the Tinney Lawsuit with the approval of Tony Wood and Paul West.  Again, the Tinney Lawsuit was never disclosed to Plaintiffs.

112.   On Tuesday, May 18, 2010, Alethean received the first $500,000 tranche from Alacrity.  Three days later, on that Friday, May 21, 2010, *IPro filed for Chapter 7 bankruptcy in the District of Nevada* (the "IPro Bankruptcy").  Tony Wood signed the petition as President, and signed the corporate resolution authorizing the filing as "Sole Director" and "Majority Shareholder."  This filing was just in time to stop the SAI Lawsuit from proceeding to jury trial as scheduled on June 1, 2010.  It also halted the Tinney Lawsuit, the LCMG Lawsuit, the Colgren Lawsuit, and prevented further claims by Statera.  The IPro Bankruptcy was never disclosed to Plaintiffs.

113.   On June 30, 2010, at 1:30 p.m., Tony Wood appeared before the Chapter 7 trustee and gave testimony under oath at the IPro meeting of creditors. When asked whether the CPA360 software had any value, Wood testified that it did not because, even if IPro could pay for completing it, other companies had caught up and now had surpassed anything CPA360 could possibly do.  He also testified that there had been no acquisitions of any of the RIA affiliates of the accounting firms, and IPro had defaulted on all of its acquisition obligations.

114.   Later that same day, just before 8:00 p.m., Tony Wood (having just testified that the CPA360 platform did not yet exist, and had no value) reassured Matthew Johnson by email that the Alethean Parties "will deliver the needed deal flow."  "We have laid out a very sustainable distribution strategy [meaning the CPA360 platform] that will change the enterprise value of Gemini moving forward."  Paul West, Dave Mazza, and Bos Smith all were copied on that email.

115.   In amended schedules filed on July 13, 2010, Tony Wood valued the CPA360 software at $1,000, and confirmed that Statera had control of the

1  incomplete software.   Less than a month later, the Alethean Parties invited

2  Matthew Johnson to join them in making a presentation to HA&W partners about

3  Gemini and how Gemini was the investment banking support behind the Alethean

4  platform.   In that presentation, the CPA360 software again was shown as the

5  foundation of the business model.  This occurred just prior to Alacrity making the

6  second $500,000 payment.

7      116.   Despite full knowledge of all of the above, Defendants continued for

8  more than two years representing to Plaintiffs that the CPA360 software was

9  deployed and operational at the HBK and HA&W firms, that the firms' CPAs were

10 using the platform, that the Alethean/Method business model was being marketed

11 to other CPA firms to increase the usage base for generation of more investment

12 banking deals, and that HBK and HA&W were fully behind and supportive of the

13 Alethean/Method business model.

14     117.   In fact, in an article on RIABiz.com dated April 11, 2012, Tony Wood

15 again told the world that he was promoting his Alethean/Method business model,

16 and mentioned the acquisition of a minority interest in HA&W Wealth

17 Management as being the first deal.

18 **EXAMPLES OF SPECIFIC MISREPRESENTATIONS OF MATERIAL**

19 **FACT**

20     118.   By email dated February 17, 2010, Dave Mazza told Matthew

21 Johnson that HA&W and Alethean had jointly purchased IPro, but that the website

22 simply had not yet rolled over.

23     119.   On March 10, 2010, Tony Wood, Dave Mazza, and Matthew Johnson

24 had their first in-person meeting.   After that meeting, Tony Wood sent Matthew

25 Johnson an email later that day.  The email attached four PowerPoint presentations,

26 one of which was entitled "An Introduction to CPA360 – Alethean.pptx."  In his

27 email, Tony Wood stated that one of the PowerPoints was a "[d]eck concerning our

28 proprietary technology."   In addition to that one PowerPoint, which is focused

directly on the CPA360 platform, two of the other three PowerPoints discuss the importance of the CPA360 platform to the business model, and represent it as a functioning system.

120.   By email dated March 11, 2010, Matthew Johnson said that he needed to obtain more information on how the loan structure might work, and Dave Mazza responded that it should not be a big deal because, "[a]s I said, the [software] on a minimum, stand-alone basis is worth $5 million (based on a written offer) and it's more than sufficient to collateralize $1-1.5 million [in] mezzanine debt."

121.   On that same day, Matthew Johnson made clear that Alacrity would not be able to provide any financing until the next month or the month after, and Dave Mazza wrote back on March 13 and tried to convince Matthew that it was not so much the money that was important, it was the appearance to the accounting firms that Gemini and Alacrity are "part of the team" and that $1 million was "small enough that making a big deal of it will concern CPA firms that Gemini won't be able to ramp to the next level."   In a separate email of the same date, Mazza told Matthew that "Alethean has developed a lot of [software] to address" the issue of screening out deals that are not worth going further on.   Of course, neither Alethean nor IPro ever fully developed any software.

122.   On March 13, 2010, Matthew Johnson, again, emailed Tony Wood, with a copy to Dave Mazza, clarifying that Alacrity could not make any commitment of funding until April.   Dave Mazza wrote back to Matthew Johnson on that same day to encourage him to make the loan, and said, "[a]s for collateral, as I indicated, I wouldn't worry.   There are lots of ways to do that with $3.5 billion under management and [software] worth a hard $5 million, there isn't a problem."

123.   In an email dated March 29, 2010, at 3:17 p.m., from Tony Wood (IPro domain) to Matthew Johnson, with a copy to Dave Mazza, Tony Wood said, "[w]e are building all the protocols and systems to support [the] Alethean/Gemini

FIRST AMENDED COMPLAINT

relationship from our side." There was, of course, no software platform in which to build any protocols or systems.

124. By email dated Sunday, April 4, 2010, 5:04 p.m. from Tony Wood (IPro domain) to Matthew Johnson, with copies to Dave Mazza, Paul West, and Bos Smith, Tony Wood said, "I was asked to [provide] 'proof' that Alethean could provide distribution and in fact have CPA firms refer business. As I anticipated and warned we opened the fire hose this week and had 7 deals hit Alethean." By "opened the fire hose" he was referring to initiating the distribution process through the CPA360 platform, which of course was impossible because that platform had never been fully developed. He went on to say, later in the email, "[w]e MUST look like ONE entity to the CPA client; too much confusion on so many names." The only way the CPA client would see "so many names" would be through the CPA360 platform, which did not exist.

125. On April 26-27, 2010, Bos Smith wrote to Matthew Johnson regarding the specifics of setting up the investment banking questionnaire in the investment banking module of the CPA360 platform, which was fraud in and of itself because there was no module to implement the questionnaire. In his April 27 email, Smith said, "[l]ooking forward to turning the machine on." There was no machine to turn on.

126. During negotiations for the first loan of $500,000, Alacrity included a provision for a personal guaranty by Tony Wood, and Paul West requested that the personal guaranty be removed. Dave Mazza agreed, saying that the personal guaranty was irrelevant because Alacrity had the software to serve as collateral. As further reassurance, Paul West provided Matthew Johnson a redlined copy of the draft Security Agreement And Promissory Note (the "Note") by email on May 16, 2010, at 5:18 p.m. In that draft of the Note, Paul West had removed Tony Wood as a guarantor, and had inserted the words "CPA 360" into certain provisions of the

Note, as shown by the excerpts below from that redlined version (the "Loan Parties" are the Alethean entities):

**4.2    Good Standing; Authority.**
(a)    Each Loan Party that is not an individual person is an entity (i) duly organized and existing and in good standing under the laws of the jurisdiction in which it was formed, (ii) duly qualified, in good standing and authorized to do business in every jurisdiction in which failure to be so qualified might have a material adverse effect on its business or assets, and (iii) has the power and authority to own each of its properties [CPA 360] and assets and to use them as contemplated now or in the future.

\* \* \*

**4.6    Title to Assets; Insurance**.  Each Loan Party has good and marketable title to **each** of its assets [CPA 360] and shall maintain its property in good repair, reasonable wear and tear excepted.

127.   The Term Sheet signed by the parties was made Exhibit "A" to the Note, and it required (among other things) that the loan be collateralized by a senior lien on "[a]ll assets of the Company, including any intellectual property and the Company's proprietary software, CPA360."

# FIRST CAUSE OF ACTION

## Fraud

### (Against All Defendants)

128.   Plaintiffs herein incorporate by this reference, paragraphs 1 through 127, inclusive, as if set forth in full herein.

129.   Each of the Defendants made false and material representations to Plaintiffs and further failed to disclose material facts, as specifically alleged above.

130.   Upon information and belief, the representations and material omissions of facts by Defendants, and each of them, were in fact false and purposely undertaken and that Defendants, and each of them, knew that the

representations were false and their act of concealment of material fact against Plaintiffs were fraudulent.

131.   When Defendants made the representations as more fully alleged hereinabove and failed to disclose material facts to Plaintiffs, they knew that these representations were false, and further, knew that the facts that were not disclosed were material to Plaintiffs.   The representations made by Defendants and Defendants' willful failure to disclose material facts, were undertaken by Defendants with the intent to defraud and deceive Plaintiffs.

132.   At the time the representations were made by Defendants, and further, at the time Defendants failed to disclose the material facts as alleged hereinabove, Plaintiffs were ignorant of the falsity of Defendants' representations and believed them to be true and, further, were ignorant of the material facts which, if disclosed, would have caused Plaintiffs not to enter into any kind of relationship with Defendants.

133.   Plaintiffs' reliance on Defendants' representations was justified because of their concerted acts of concealment and fiduciary duties owed to Plaintiffs by Defendants.

134.   As a proximate result of Defendants' fraud and deceit and the facts herein alleged, Plaintiffs were damaged all according to proof at time of trial.

135.   The aforementioned conduct of Defendants were intentional misrepresentations and concealment of material facts known to Defendants with the intention on the part of the Defendants to deprive Plaintiffs of property or legal rights or otherwise cause injury, and were despicable in that they subjected Plaintiffs to cruel and unjust hardship in conscious disregard of Plaintiffs' rights so as to justify an award of exemplary and punitive damages.

FIRST AMENDED COMPLAINT

## SECOND CAUSE OF ACTION

### Fraudulent Inducement

### (Against All Defendants)

136.   Plaintiffs herein incorporate by this reference, paragraphs 1 through 135, inclusive, as if set forth in full herein.

137.   Defendants falsely represented or omitted material facts concerning Alethean's business that they had a duty to disclose.

138.   Defendants knew or believed the representations were false or made the representations with reckless indifference to the truth.

139.   Upon information and belief, the representations and material omissions of facts by Defendants were undertaken to induce Plaintiffs into entering into the above transactions and execute and perform on the Note as alleged more fully above.   The representations made by Defendants and Defendants' willful failure to disclose material facts were undertaken by Defendants with the intent to induce, defraud, and deceive Plaintiffs.

140.   Plaintiffs acted in justifiable reliance on the false representations and material omissions of material fact, as Plaintiffs were ignorant of the falsity of Defendants' representations and believed them to be true and, further, were ignorant of the material facts which, if disclosed, would have caused Plaintiffs not to enter into any kind of agreement with Defendants.

141.   As a proximate result of Defendants' fraud and deceit and the facts herein alleged, Plaintiffs have been damaged by its reliance on Defendants misrepresentations.

142.   The aforementioned conduct of Defendants were intentional misrepresentations and concealment of material facts known to Defendants with the intention on the part of the Defendants to deprive Plaintiffs of property or legal rights or otherwise cause injury, and were despicable in that they subjected

1 | Plaintiffs to cruel and unjust hardship in conscious disregard of Plaintiffs' rights so
2 | as to justify an award of exemplary and punitive damages.

3 | **THIRD CAUSE OF ACTION**

4 | **Fraudulent Transfer**

5 | **(Against Defendants Paul M. West and Does 1 through 50)**

6 | 143.   Plaintiffs herein incorporate by this reference, paragraphs 1 through
7 | 142, inclusive, as if set forth in full herein.

8 | 144.   Defendants are obligated to pay Plaintiffs the amount required by the
9 | Note.

10 | 145.   Defendants knew that they would default on the Note and, as a result,
11 | that Plaintiffs would attempt to collect the monies owed to Plaintiffs from
12 | Defendants, as joint surety of the Note.

13 | 146.   Upon information and belief, Defendants transferred their assets to
14 | various individuals and business entities specifically to evade potential creditors
15 | including Plaintiffs.

16 | 147.   Upon information and belief, Defendants received no consideration in
17 | exchange for the above transfers, and Defendants took these actions in an attempt
18 | to hinder, delay, and defraud Plaintiffs by making Plaintiffs' efforts to collect more
19 | difficult.

20 | 148.   Upon information and belief, Defendants have also taken other actions
21 | and transferred other assets with the intent to hinder, delay, and defraud Plaintiffs
22 | by making collection of the amount owed to Plaintiffs more difficult.

23 | 149.   As a direct and proximate cause of Defendants' actions, Plaintiffs
24 | have been damaged in an amount to be ascertained at the time of trial.

25 | 150.   Defendants' fraudulent actions entitle Plaintiffs to punitive damages.
26 | Defendants acted with malice, i.e., a "conscious disregard" of Plaintiffs' rights and
27 | intentionally tried to defraud Plaintiffs through concealing and transferring assets.

28 |

FIRST AMENDED COMPLAINT

1 | Accordingly, Defendants should be forced to pay punitive damages in an amount
2 | appropriate to punish and/or deter future misconduct.

3 | ### FOURTH CAUSE OF ACTION

4 | ### Constructive Fraudulent Transfer

5 | ### (Against Defendants Paul M. West and Does 1 through 50)

6 | 151.   Plaintiffs herein incorporate by this reference, paragraphs 1 through
7 | 150, inclusive, as if set forth in full herein.

8 | 152.   Defendants are obligated to pay Plaintiffs the amount required by the
9 | Note.

10 | 153.   Defendants knew that they would default on the Note and, as a result,
11 | that Plaintiffs would attempt to collect the monies owed to Plaintiffs from
12 | Defendants, as joint surety of the Note.

13 | 154.   Upon information and belief, Defendants transferred their assets to
14 | various individuals and business entities specifically to evade potential creditors
15 | including Plaintiffs.

16 | 155.   Upon information and belief, Defendants did not receive a reasonably
17 | equivalent value in exchange for the transfer of such assets.

18 | 156.   Upon information and belief, Plaintiffs' right to recover payments
19 | from Defendants arose before Defendants transferred and/or encumbered such
20 | assets.

21 | 157.   As a result of the actions and transfers described herein, Defendants'
22 | assets are significantly diminished below the amount owed to Plaintiffs.   Had
23 | Defendants not taken such actions and transferred such assets, Defendants' assets
24 | may have been sufficient to cover Defendants' obligations to Plaintiffs.   Upon
25 | information and belief, Defendants are now essentially insolvent as a result of
26 | these actions and transfers.

27 | 158.   As a direct and proximate cause of Defendants' actions, Plaintiffs
28 | have been damaged in an amount to be ascertained at the time of trial.

1    159.   Defendants' fraudulent actions entitle Plaintiffs to punitive damages.

2  Defendants acted with malice, i.e., a "conscious disregard" of Plaintiffs' rights and

3  intentionally tried to defraud Plaintiffs through concealing and transferring assets.

4  Accordingly, Defendants should be forced to pay punitive damages in an amount

5  appropriate to punish and/or deter future misconduct.

6                          **RELIEF REQUESTED**

7          **WHEREFORE, Plaintiffs pray for judgment against Defendants, and**

8  **each of them, as follows:**

9    1.    For compensatory damages in an amount to be prove at the time of

10          trial but believed to be in excess of $1,000,000;

11   2.    For special damages, expenses, general damages, and other damages to

12          be proven at the time of trial;

13   3.    For punitive damages;

14   4.    For interest on the damages according to proof at the legal rate;

15   5.    For attorney's fees;

16   6.    For costs of suit; and

17   7.    For such other further relief as the Court may deem proper

18

19                        **DEMAND FOR JURY TRIAL**

20         Plaintiffs pursuant to Rule 38, F.R.C.P., hereby demand a trial by jury of all

21  issues so triable.

22

23  DATED: February 12, 2016                    **KAHANA LAW, P.C.**

24

25                                              By: _____

26                                              Samuel Yu
                                                Attorneys for Plaintiffs Matthew
27                                              Johnson, Nathan Johnson, Gemini
                                                Partners, Inc., and Alacrity Capital
28                                              Offshore Fund, Ltd.

FIRST AMENDED COMPLAINT

# PROOF OF SERVICE

STATE OF CALIFORNIA                                                                )
                                                                                   )
COUNTY OF ORANGE                                                                   )

      I am employed in the County of Orange, State of California.  I am over the age of 18, and not a party to the within action.  My business address is Kahana Law, P.C., 18101 Von Karman Avenue, Suite 230, Irvine, CA 92612.  On the date below, I served the foregoing document(s) described as:

## FIRST AMENDED COMPLAINT

By sending a true copy therof to the address listed below:

## SERVICE LIST ATTACHED

**[X]  BY CM/ECF ELECTRONIC DELIVERY:** By electronically filing the foregoing document(s) using the CM/ECF system. Service of an electronically filed document upon a CM/ECF User who has consented to electronic service is deemed complete upon the transmission of the Notice of Electronic Filing ("NEF"). The NEF will be maintained with the original document(s) in our office.

**[X]  BY E-MAIL OR ELECTRONIC TRANSMISSION.** I caused the documents to be sent to the persons at the email address listed above in an Adobe PDF file, and the transmission appeared to be successful.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

      Executed on February 12, 2016 at Irvine, California.


                        /s/ Sydney Pritchard_____
                        Sydney Pritchard

1

## SERVICE LIST

2

3 Olivia O. Bissell, Esq.
**BISSELL & ASSOCIATES, P.C.**

4 1028 North Lake Avenue, Suite 101
Pasadena, CA 91104

5 oliviabissell@gmail.com

6

7 Dan L. Longo, Esq.
Peter A. Martin, Esq.

8 **MURCHINSON & CUMMING, LLP**
18201 Von Karman Ave., Suite 1100

9 Irvine, CA 92612
dlongo@murchinsonlaw.com

10 pmartin@murchinsonlaw.com

11

12 Calvin E. Davis, Esq.
Aaron P. Rudin, Esq.

13 **GORDON & REES LLP**
633 West Fifth Street, 52nd Floor

14 Los Angeles, CA 90071

15 cdavis@gordonrees.com
arudin@gordonrees.com

16

17 Nicholas J. Dertouzous, Esq.
Richard G. Witkowski, Esq.

18 **NICOLA GUDBRANSON & COOPER, LLC**

19 25 West Prospect Avenue,
Cleveland, OH 44108

20 dertouzos@nicola.com

21 witkowski@nicola.com

22

23

24

25

26

27

28

1
PROOF OF SERVICE